UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                    19-cr-40 (PKC)

                -against-

                                                    OPINION AND ORDER

FAIZUL HUSSAIN,

                              Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.:

        Defendant Faizul Hussain moves through counsel for a reduction of his sentence

pursuant to the First Step Act of 2018, as codified at 18 U.S.C. § 3582(c)(1)(A).  (ECF 50, 54.)

Hussain argues that there are extraordinary and compelling reasons to reduce his sentence,

namely: (1) his end-stage glaucoma, which has left him effectively blind and experiencing

chronic pain, headaches, and dizziness, and which has led to eye surgery and a protracted stay in

the ICU due to complications from that surgery; (2) the inability of the Bureau of Prisons

("BOP") to provide necessary and timely treatment; and (3) the extra-punitive nature of

incarceration during the COVID-19 pandemic.  He requests that the remainder of his term of

imprisonment be converted to a term of supervised release with a condition of home detention.

        Because the Court concludes that there are extraordinary and compelling reasons

to reduce Hussain's sentence, and also concludes that the factors listed under 18 U.S.C. §

3553(a) counsel in favor of a sentence reduction, Hussain's motion will be granted.

BACKGROUND

        In 2013, Hussain was diagnosed with genetic glaucoma.  (PSR ¶ 49.)  Over the

next few years, he underwent five surgeries on his eyes to treat the disease, and as of 2020 he

was completely blind in his right eye and retained approximately twenty percent functionality in his left eye.  (Id.)  Prior to being incarcerated he had been unemployed and collecting full Social Security disability benefits since 2014 due to the disease's progression.  (Id. ¶ 58.)

In September 2018 Hussain exchanged a series of messages with a New York City Police Department ("NYPD") undercover officer ("UC-1") posing as a 13-year old girl.  (Id. ¶ 9.)  Hussain maintained a profile on a social media dating application that stated that, among other things, he was "horny asf," and he messaged UC-1 on this application requesting naked photographs.  (Id.)  UC-1 responded, "im 13 I don't have pics like that."  (Id.)  The two progressed to texting via cellphones, and Hussain and UC-1 exchanged a series of text messages over the next ten days.  (Id. ¶ 10.)  UC-1 established that she was located in New York, NY, and Hussain stated that he was in Queens, NY.  (Id.)  Hussain asked UC-1 if she "ever fuck" and UC-1 told Hussain that she had.  (Id. at ¶ 11.)  Hussain asked UC-1 "How old u first fuck," to which UC-1 responded "Like beginning of summer… I was still 13."  (Id.)  Hussain then told UC-1, "I want to eat and suck you pussy."  (Id.)  During these conversations, Hussain repeatedly asked UC-1 to send him naked photographs of herself, and he sent multiple sexually suggestive photographs of himself to UC-1.  (Id. ¶ 12.)

The exchange culminated in an agreement to meet in person at a fast-food restaurant in the Lower East Side of New York, NY on September 27, 2019.  (Id. ¶ 13.)  Hussain agreed to bring a condom and $50.  (Id.)  When Hussain arrived at the restaurant, he was approached by NYPD officers and arrested.  (Id. ¶¶ 15–16.)  During a post-arrest search, the officers recovered a cellphone and condoms from Hussain.  (Id. ¶ 16.)  Hussain was advised of his Miranda rights, which he waived, and he told the officers that that he had sent the messages

to UC-1 and that his intention was to meet and engage in sexual activity with UC-1, whom he believed to be a 13-year old female.  (Id.)

At a bail hearing on October 2, 2018, Magistrate Judge Debra Freeman released Hussain on a personal recognizance bond of $100,000.  (ECF 6.)  Judge Freeman imposed, among others, the following standard conditions: strict pretrial supervision, a mental health evaluation, home detention, electronic monitoring, and GPS monitoring.  (Id.)  Release was also conditioned on a series of special conditions, including that Hussain: reside at his parents' home; have no contact with minors except family members, and then only in the presence of another adult; possess no form of pornographic material; have no access to a computer or any other electronic device with internet access; have no access to any devices capable of taking photographs or video, or storing or permitting viewing of photos or video; be accompanied by an adult family member any time he left the home; and have at least one other adult present in the home at all times when he was there.  (Id.)

On January 17, 2019, Hussain waived indictment and was charged by information with one count of attempted inducement of a minor to engage in sexual activity in violation of 18 U.S.C. §§ 2322(b) & 2.  (ECF 14, 15.)  On November 17, 2019, Hussain filed a second waiver of indictment, and the government filed a superseding information charging him with one count of attempted receipt of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(B), (b)(1), & 2. (ECF 25, 26.)

Also on November 7, 2019, Hussain appeared before the Honorable William H. Pauley III and, pursuant to a plea agreement, pleaded guilty to the one count of attempted receipt of child pornography.  (PSR ¶ 4.)  In the plea agreement, the parties stipulated that the applicable

range under the United States Sentencing Guidelines was 135 to 168 months' imprisonment and that the offense carried a mandatory minimum sentence of 60 months' imprisonment.  (Id. ¶ 5.)

Probation determined that Hussain fell into Criminal History Category I and calculated a guidelines range of 135 to 168 months' imprisonment, the range stipulated in the plea agreement, but recommended a downward variance to 72 months.  (PSR at 19.)  It based this recommendation on Hussain's lack of other criminal history, his debilitating medical condition, and the likelihood that—because glaucoma is a progressive disease—the impending complete loss of his eyesight would permanently incapacitate him from viewing images of minors or engaging with them online.  (Id. at 20.)

Prior to sentencing, Hussain's counsel also submitted mental health evaluations from two doctors.  Chriscelyn M. Tussey, Psy. D., ABPP, conducted a neuropsychological evaluation in July 2019 and determined that Hussain's intellectual abilities were "Low Average to Extremely Low."  (Id. ¶ 51.)  Dr. Tussey reported that Hussain would otherwise merit consideration for a diagnosis of intellectual disability, but such a diagnosis would require documentation of deficits during childhood.  (Id.)  The same month, Meg S. Kaplan, Ph. D. completed a psychosexual and risk assessment and concluded that Hussain did not have a paraphilic or hypersexual disorder.  (Id. ¶ 52.)  At the time of the crime, Hussain was suffering from "major depression" and was "despondent."  (Id.)  The report concluded that his risk of re-offense was low and could be further lowered by sex offender specific treatment and the standard conditions of supervised release.  (Id.)  In addition to the episode of "major depressive disorder," Dr. Kaplan indicated that Hussain suffered from an unspecified neurodevelopmental disorder; however, she could not administer many of the tests that might provide a more specific diagnosis because Hussain's glaucoma left him unable to read.  (Id. ¶ 53.)  In his presentation to Judge

4

Pauley, Hussain's counsel described him as having, "in many ways, the mind of a teenager."
(Def. Br., Ex B. (Sentencing Transcript) at 5.) (ECF 52.)

   At Hussain's February 28, 2020 sentencing, Judge Pauley calculated the
applicable guideline range as 135 to 168 months' imprisonment.  (Id. at 7.)  Judge Pauley varied
downwards from the guideline range and sentenced Hussain to the mandatory minimum of 60
months' imprisonment, followed by five years of supervised release.  (Id. at 10.)  In assessing the
section 3553(a) sentencing factors, Judge Pauley emphasized that this was "a very sad case," and
noted that no one seemed able "to explain why Mr. Hussain did what he did."  (Id. at 7–8.)
Judge Pauley concluded that while there was obviously a compelling need for general deterrence
regarding the criminal activity, and that specific deterrence was also warranted for Hussain
himself, the guideline range "certainly" was "very wide of what is necessary . . . to ensure that
Mr. Hussain will not, ever again, engage in such conduct."  (Id. at 8.)  Judge Pauley described
Hussain as suffering from "significant disabilities;"  his cognitive abilities were "somewhat
impaired," he had "lost vision in one eye," and he was "losing his vision in another eye," leaving
him "essentially entirely visually impaired."  (Id.)  Even prior to being charged with the crime at
issue, his disabilities had forced him out of the workforce and onto Social Security disability.
(Id.)  Outside of "the tragedy of the last 16 or 18 months," Hussain had lived a law-abiding life
and been a productive member of society, and even at the time of sentencing he appeared to have
an optimistic outlook on life.  (Id. at 9.)  Judge Pauley believed that Hussain displayed genuine
remorse and was ashamed of what he done.  (Id.)  Judge Pauley's overall assessment was that
"that the mandatory minimum sentence in this case will amply satisfy the ends of the criminal
justice system in ensuring that his conduct is discouraged and that he makes the proper road to
recovery."  (Id.)

In addition to the standard conditions of supervised release, Judge Pauley imposed special conditions connected to his offense, including that Hussain must:

- submit his person, property, residence, vehicle, papers, computer, other electronic communications, data storage devices, cloud storage or media and effects to a search by any United States probation officer and, if needed, with the assistance of law enforcement;

- participate in an outpatient mental health treatment program approved by the probation office;

- undergo sex offense-specific evaluations and participate in an outpatient sex offender treatment and/or outpatient mental health treatment program;

- not view, access, possess, and/or download any pornography, including of adults, unless approved by the sex offender-specific treatment provider;

- waive his right of confidentiality in any records for mental health assessment treatment;

- not have deliberate contact with any child under 18 years of age unless approved by the probation office, not loiter within 100 feet of places regularly frequented by children under the age of 18 such as schoolyards, playgrounds, and arcades, not view and/or access any web profile of users under the age of 18;

- be restricted from viewing, accessing, possessing, and/or downloading any sexually explicit material involving minors including those created via the method of morphing or other image creation format;

- not access any websites, chat rooms, instant messaging, or social networking sites where his criminal history, including this conviction, would render such access in violation of the terms of service of that website, chat room, instant messaging, or social networking site;

- permit the probation office to install any application or software that allows it to survey and/or monitor all activity on any computers, automated services, or connected devices that he will use during the term of supervision and that can access the Internet.

(Id. at 10–14; ECF 35 at 5.)

In recognition of Hussain's health challenges, Judge Pauley recommended to the BOP that he be designated to a federal medical facility, with a surrender date of May 27, 2020.

6

(Sent'g Tr. at 15–16; ECF 35 at 2.)  This date was twice adjourned on account of the COVID-19 pandemic and concerns that the BOP's surrender quarantine practices would pose a particular hardship for Hussain given his medical condition; an ultimate surrender date was set for September 30, 2020.  (ECF 38, 42.)

Despite Judge Pauley's recommendation, the BOP concluded that Hussain's condition did not warrant placement in a medical facility, and he was assigned to FCI Loretto. (Def. Br. at 4 (citing Ex. D).)  The S.D.N.Y. probation office subsequently confirmed that the BOP had received Hussain's medical records and again requested designation to medical facility; the request was denied, but the BOP stated that Hussain would be assessed by the medical staff at FCI Loretto and could potentially be referred for placement at another facility if it was determined his medical needs could not be addressed at FCI Loretto.  (Id.)  Prior to Hussain's surrender, Hussain's counsel provided his medical records directly to the FCI Loretto staff and received approval of an accommodation for Hussain to bring his probing cane into the facility. (Def. Br. at 4 (citing Exs. E, F).) (ECF 51.)  After he surrendered on September 30, 2020, this accommodation was apparently rescinded, and Hussain did not receive access to his probing cane until two years later.  (Def. Br. at 4 (citing Ex. G).)

Hussain is now 48 years old and is currently serving his sentence at FCI Loretto. (Gov. Opp. at 2.) (ECF 56.)  Before surrendering, Hussain spent approximately 21 months in home detention, and he has now served approximately 33 months of his 60-month sentence. (PSR at 2; Def. Br. at 3)  He has received no disciplinary infractions.  (Def. Br. at 8 (citing Ex. O).)  Accounting for good time credit, he is currently scheduled for release on December 26, 2024.[1]

---

[1] See https://www.bop.gov/inmateloc/ (last accessed July 12, 2023).

During his term of term of incarceration, Hussain's physical health has continued to deteriorate.  Hussain received an initial medical assessment upon surrendering in September 2020.  Shortly thereafter, during follow-up appointments in both October and November of 2020, Hussain complained of worsening vision, sudden sensations of pressure in his left eye, chronic headaches, and dizziness.  (Def. Br. at 4 (citing Ex. H.).)  FCI Loretto's records indicate that Hussain described the "the sensation in the eye as being poked by a needle."  (Def. Br., Ex. H.)  In December 2020, Hussain tested positive for COVID-19.  (Def. Br. at 8 (citing Ex. N).)

Hussain was referred to an ophthalmologist, Dr. Thomas C. Trevorrow, for his eye issues, and his first visit was in March 2021.  (Def. Br., Ex. I.)  Dr. Trevorrow described Hussain as "essentially blind," warned that the pain and discomfort in his eye might eventually "need to be fixed in an urgent fashion," and recommended a change in his eye drop prescription. (Id.)  Dr. Trevorrow examined Hussain again in April 2021, and again recommended a change in his eyedrop prescription in order "to try to bring down his pressure" and "prevent total blindness."  (Id.)  After a follow-up in August 2021, Dr. Trevorrow described the eye exam as "very concerning," and recommended either an additional, potentially expensive eye drop, or an ablative procedure—these were described as "a last ditch effort to save the extremely small but potentially somewhat important vision that is left . . . ."  (Id.)  Hussain had several additional follow-up exams with Dr. Trevorrow, with reports filed on March 2, 2022, May 4, 2022, and May 24, 2022.  (Id.)  After the second May exam, Dr. Trevorrow concluded that Hussain was experiencing "intraocular pressures that are too high for his end stage glaucoma," and recommended that Hussain see a glaucoma specialist in Pittsburgh, noting that there were no specialists available locally.  (Id.)  In a June 8, 2022 letter to a specialist, Dr. Trevorrow wrote

that "[i]t appears . . . his glaucoma is simply worsening and perhaps the tube is failing.[2]  I am referring him to you for any possible intervention including changing his drop regimen, performing additional surgery, or doing an ablative procedure."  (Def. Br., Ex. J.)  The consultation request was approved on June 13, 2022, but due to logistical hurdles Hussain was not scheduled to see the specialist until December 2022.  (Def. Br., Ex. G.)

In October 2022, while waiting to see the specialist, Hussain experienced a "further but significant loss of vision" in his left eye that lasted multiple days.  (Id.)  A fellow inmate brought him to Health Services at FCI Loretto, where Hussain reported the loss of vision and that the chronic pain and pressure in his eye had also worsened; he was referred to the emergency room at the University of Pittsburgh Medical Center in Altoona, PA.  (Id.)  At the emergency room, he reported that "these episodes constantly happen to him on a regular basis," and he was not sure why on this occasion he was sent to the emergency room.  (Def. Br., Ex. L.)  After returning from the emergency room, Hussain was allowed to use the probing cane he had brought with him when he surrendered.  (Def. Br., Ex. G.)

On November 16, 2022, Dr. Trevorrow again wrote to the glaucoma specialist and requested Hussain's appointment be advanced, stating that he needed "care as soon as possible . . . to try to save his small amount of remaining vision so that he does not become completely blind in both eyes."  (Def. Br. at 7 (citing Ex. M).)  On November 30, 2022, Hussain visited the glaucoma specialist who described his glaucoma as "very severe" and determined that Hussain would need surgery to reroute the tube in his left eye, likely followed by a corneal graft, and cataract surgery.  (Reply, Ex. B.) (ECF 57.)

---

[2] The letter elsewhere noted that Hussain "had surgical procedures in both eyes and appeared to have a failed bleb in the right eye and a tube had been placed in the left eye."  (Def. Br., Ex. J.)

On April 19, 2023, Hussain underwent a corneal transplant in his left eye.  (Def. Ltr. of July 3, 2023 (ECF 59), Ex. B at 47.)  On June 10, 2023, Hussain was sent to the emergency room after experiencing swelling, painful radiating pressure, and a loss of vision in his left eye.  (Id. at 19–20.)  He was admitted to the ICU with a corneal ulcer and he began receiving eye drop administrations every other hour.  (Id. at 15–16.)  Upon admission, his treating physicians indicated that, once discharged, Hussain would require eye drop administration by FCI Loretto Health Services and "frequent follow up evaluations in Pittsburgh for at least one month."  (Id. at 16.)  A few days later, it was determined that he had an infection in his cornea that was getting worse; eye drop administration was increased to every hour, and a biopsy was performed.  (Id. at 13.)  On June 21, 2023, Hussain was transferred to the ICU at a different hospital with an ophthalmology clinic.  (Id. at 9–10.)  As of June 29, 2023, Hussain remained in the hospital receiving hourly administrations of a half-dozen eye drops medications.  (Id. at 1–7.)

On August 22, 2022, Hussain requested that the Warden of FCI Loretto reduce his sentence to time served and received no response.  (Def. Br. at 6 (citing Ex. K).)  On January 6, 2023, Hussain filed the instant motion for reduced sentence and filed an amended motion the next day.  (ECF 50, 54.)  The government filed a response in opposition to the motion on February 8, 2023.  (ECF 56.)  Hussain filed a reply on February 23, 2023, and submitted follow-up letters on April 24, 2023, and July 3, 2023.  (ECF 57, 58, 59.)

DISCUSSION

     A.    <u>Applicable Law</u>

        Upon motion of the Director of the BOP, or of a defendant who has exhausted all administrative remedies, a court "may reduce" the defendant's sentence if it finds that "extraordinary and compelling circumstances warrant such a reduction."[3]  <u>See</u> 18 U.S.C. § 3582(c)(1)(A)(i).  The court must also consider the factors set forth in 18 U.S.C. § 3553(a) "to the extent they are applicable" and must find that the reduction is "consistent with the applicable policy statements issued by the Sentencing Commission."  <u>Id.</u> § 3582(c)(1)(A).

        "Before it can reduce a term of imprisonment or release a defendant under § 3582(c)(1)(A), a district court must 'find[ ] that . . . extraordinary and compelling reasons warrant such a reduction.'"  <u>United States v. Jones</u>, 17 F.4th 371, 374 (2d Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)).  District courts have "broad discretion" when considering compassionate release motions brought by defendants and are free to "consider the full slate of extraordinary and compelling reasons that may warrant an imprisoned person's release."  <u>United States v. Amato</u>, 48 F.4th 61, 66 (2d Cir. 2022) (internal quotation marks omitted).  "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . <u>alone</u> shall not be considered an extraordinary and compelling reason'" for sentence reduction.  <u>United States v. Brooker</u>, 976 F.3d 228, 237–38 (2d Cir. 2020) (quoting 28 U.S.C. § 994(t)).

        "[E]xtraordinary and compelling reasons are necessary—but not sufficient—for a defendant to obtain relief under § 3582(c)(1)(A)."  <u>Jones</u>, 17 F.4th at 374.  Even where such

---

[3] Hussain, through counsel, submitted a request to the Warden of FCI Loretto on August 19, 2022, and more than thirty days passed before he filed the instant motion in this Court.  (Def. Br. at 10 n.3 (citing Ex. K)).  The Government does not contest exhaustion.  (Gov. Opp. at 3 n.1.)

circumstances exist, "the court must also consider 'the factors set forth in section 3553(a) to the extent that they are applicable' before it can reduce the defendant's sentence." Id. (quoting 18 U.S.C. § 3582(c)(1)(A)).  As applicable here, section 3553(a) requires a court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available; . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]
>
> . . .

18 U.S.C. § 3553(a).  In other words, to succeed on a motion for sentence reduction, "the inmate must demonstrate that his proffered circumstances are indeed 'extraordinary and compelling' such that, in light of these § 3553(a) factors, a sentence reduction is justified under § 3582(c)(1)(A) and would not simply constitute second-guessing of the sentence previously imposed." United States v. Keitt, 21 F.4th 67, 71 (2d Cir. 2021).

Finally, the Court must find that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  The

United States Sentencing Commission is required by statute to promulgate "general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) . . . [that] describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t); Brooker, 976 F.3d at 232.  The Sentencing Commission has promulgated Guideline section 1B1.13, which currently applies only to motions made by the BOP—not to motions brought by defendants.[4] Brooker, 976 F.3d at 232, 235–36; U.S.S.G. § 1B1.13.

Even upon a defendant's motion, however, district courts may still look to section 1B1.13 for guidance in exercising their discretion.  See, e.g., United States v. Rodriguez, 16 Cr. 07 (AJN), 2020 WL 7640539, at *3 (S.D.N.Y. Dec. 23, 2020); United States v. Burman, 16 Cr. 190 (PGG), 2021 WL 681401, at *3, 5 (S.D.N.Y. Feb. 21, 2021).  The commentary notes to section 1B1.13 provide that extraordinary and compelling reasons exist, for example, where the defendant is "suffering from a serious physical or medical condition" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13 n.1(A)(ii)(I).  The commentary notes also clarify that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment," and "the fact that an extraordinary and compelling reason reasonably

---

[4] The Sentencing Commission has submitted amendments to the Sentencing Guidelines, scheduled to take effect November 1, 2023, that update section 1B1.13 to reflect that the First Step Act of 2018 amended section 3582(c)(1)(A) to allow for reductions in sentence upon the motion of the defendant.  Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (published May 3, 2023); see also U.S. Sent'g Comm'n, Official Text Version of 2023 Amendments to the Guidelines Manual (Effective November 1, 2023), , (https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf) (last accessed July 12, 2023).  The amendments also move the commentary notes into the policy statement itself and add additional language regarding what circumstances qualify.

could have been known or anticipated by the sentencing court does not preclude consideration for a reduction . . . ."  Id. § 1B1.13 n.2.  Proposed amendments to section 1B1.13, effective November 1, 2023, add that an extraordinary and compelling reason exists where a "defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death."  Sentencing Guidelines for United States Courts, 88 Fed. Reg. 28254 (published May 3, 2023).

"[A] mandatory minimum sentence does not preclude a district court from reducing a term of imprisonment on a motion for compassionate release."  United States v. Halvon, 26 F.4th 566, 570 (2d Cir. 2022).

B.    Application

1.    Whether there are extraordinary and compelling reasons
      for sentence reduction

Hussain argues that the following factors constitute extraordinary and compelling reasons to reduce his sentence: (1) his end-stage glaucoma, which has left him effectively blind and experiencing chronic pain, headaches, and dizziness, and which has led to eye surgery and a protracted stay in the ICU due to complications from that surgery; (2) the inability of the BOP to provide necessary and timely treatment; and (3) the extra-punitive nature of incarceration during the COVID-19 pandemic.  The Court concludes that Hussain's current medical conditions, in combination with the limits on BOP's ability to provide appropriate care, constitute extraordinary and compelling reasons for a sentence reduction.

The government argues that Hussain has not established an extraordinary and compelling reason justifying compassionate release.  Though the government concedes the situation has become more severe, Judge Pauley explicitly considered Hussain's medical

situation at sentencing and expressly relied on his condition when departing from the guidelines and determining that Hussain should receive only the mandatory minimum sentence.  (Gov. Opp. at 3.)  The government urges that Hussain's situation has already been full accounted for at sentencing and no further mitigation through compassionate release is required.  (Id.) Additionally, the government argues that the claim that the BOP has been unable to provide adequate care is belied by the record—the BOP has arranged repeated trips to see an ophthalmologist, arranged a visit with a glaucoma specialist, and has taken the defendant to the hospital when required.[5]  (Id. at 3–4.)

The Court respectfully disagrees.  There is no bar on reassessing factors previously considered during sentencing on a motion for compassionate release, accord U.S.S.G. § 1B1.13 n.2, and section 3582(c)(1)(A) explicitly directs the Court to reconsider the 3553(a) factors "to the extent they are applicable,"  18 U.S.C. § 3582(c)(1)(A).  Furthermore, Hussain's current situation is, as the government concedes, more severe than recounted by Judge Pauley at the time of sentencing.  Judge Pauley described his condition primarily in terms of a lack of functionality:

> He's lost vision in one eye, he is losing his vision in another eye until he became essentially entirely visually impaired. . . . When he is released from prison he is not likely to be able to really enter or I should say re-enter the work force, and, in fact, even before he was charged with this crime he had to leave the work force and has been on Social Security disability and would be in the most dire of all straits if he did not have a comfortable home to live in provided by his parents and shared with some of his siblings and their families.

---

[5] The Court notes that the government's response was submitted prior to Hussain's corneal transplant and subsequent complications, so its position does not directly reflect these factual changes.

(Sent'g Tr. at 9–10.)  This description does not include or contemplate the chronic pain Hussain has since experienced, the repeated trips to the emergency room, the potential need for multiple surgeries, or a protracted stay in the ICU.

When Hussain arrived at FCI Loretto in September 2020, it was no secret that he had degenerative, end-stage glaucoma; he had already had five surgeries related to the disease and due to its progression, he had been on Social Security disability for approximately six years. Shortly after beginning his term of imprisonment, he reported to the Health Services staff that the pain in his eye was like "being poked by a needle."  (Def. Br., Ex. H.)  Despite this, it would be over two years before he saw a physician who specialized in his condition.  The BOP was severely strapped and tested during the first two years of Hussain's incarceration because of the impact of COVID-19 on staff and inmates, including restrictions on movement and quarantine requirements.  Nationally, even persons at liberty had difficulties in accessing certain types of medical care.  When he first saw a general ophthalmologist in March 2021, the report was that the condition of his eyes might warrant "urgent" intervention as they deteriorated; by August 2021, the same ophthalmologist was recommending an "ablation procedure."  (Def. Br., Ex. I.) It would be another fourteen months—a period which included several additional, dour assessments from the ophthalmologist and a trip to the emergency room—before Hussain was able to see a glaucoma specialist, a specialist who immediately recommended at least one, and possibly three, eye surgeries.  Throughout this entire period the record indicates Hussain suffered chronic headaches, eye pain, dizziness, and periodic total loss of vision.  He has also at times required the assistance of other prisoners to perform the daily tasks of life.

As of June 29, 2023, Hussain was in intensive care at a local hospital for the third consecutive week and with no clear discharge date.  He had lost vision in his left eye and was

16

receiving hourly administrations of multiple sets of medicated eyedrops.  He arrived there after developing a corneal ulcer because of an infection arising out of a corneal transplant.  Once discharged, he would likely require administration of eyedrops by BOP staff and frequent follow-up appointments in a hospital in Pittsburgh for at least a month.  He may also require additional surgeries to his eyes.

The Court concludes that Hussain suffers from "a serious physical or medical condition" from which he "is not expected to recover" and which has substantially diminished his "ability . . . to provide self-care within the environment of a correctional facility."  U.S.S.G. § 1B1.13 n.1(A)(ii)(I).  Further, he suffers from "a medical condition that requires long-term or specialized medical care" without which he is "at risk of serious deterioration in health."  Sentencing Guidelines for United States Courts, 88 Fed. Reg. at 28254.  While the Court is not bound by these current or proposed policy statements, it takes guidance from them and finds them instructive as to Hussain's circumstances.  The Court commends the efforts taken by BOP staff on behalf of Hussain, but it appears that his medical needs have stressed the limits of what care the BOP can effectively provide.

Accordingly, the Court concludes that Hussain's medical issues and the additional need for specialized care constitute extraordinary and compelling reasons for reducing his sentence.

      2.    <u>Whether the § 3553(a) factors counsel in favor of<br>sentence reduction</u>

The Court also finds that the factors under 18 U.S.C. § 3533(a) counsel in favor of a sentence reduction.  The Court is guided here by Judge Pauley's analysis at sentencing.

The nature and circumstances of the crime here were most serious and posed a threat to innocent children.  Hussain attempted to meet and engage in sexual activity with a

person he believed to be a 13-year-old girl.  There is certainly a compelling need for general deterrence of this kind of conduct.  Specific deterrence as to Hussain was also warranted, although the Court agrees with Judge Pauley that the applicable guideline range was "very wide" of what would be necessary to ensure Hussain never again engages in this type of conduct. (Sent'g Tr. at 8.)  The deterrence factors and the need for punishment counsel against a reduced sentence.

The need to protect the public from further crimes by Hussain has become, with the advancement of his progressive disease, less compelling.  Hussain has no other criminal history, and his ability to reoffend has been severely curtailed by his glaucoma.  At the time of his plea allocution, Hussain's vision had deteriorated to the point where he had to be read the information filed by the government against him.  (ECF 29 at 2.)  By the time of sentencing, he required the use of a probing cane, and probation recommended a downward variance from the guidelines in part because Hussain's "ability to view images of minors and engage with them online will be severely incapacitated" by the impending complete loss of his eyesight.  (PSR at 20.)  In addition to these physical barriers to further offenses, Judge Pauley determined that Hussain displayed genuine remorse and shame for his actions and that Hussain's family, who would be responsible for his care during a period of home detention, were "enormously supportive" and "truly committed to seeing that he lives a law-abiding life going forward." (Sent'g Tr. at 7.)

Three years later, the physical impediments to his ability to reoffend have continued to mount.  Hussain complied with all the terms of his supervision between his arrest in September 2018 and his surrender in September 2020, and he has committed no violations during his incarceration.  Given his disabilities and the conditions to be imposed, home detention

18

is highly likely to provide incapacitation similar in effect to a term of imprisonment.  This factor counsels in favor of the requested sentence reduction.

As to providing Hussain with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, this factor strongly cuts in favor of the requested sentence reduction.  Hussain has a serious, long-term degenerative medical condition and is currently—or until recently was—off-premises and in the ICU of a hospital.  He has suffered complications from surgery related to this condition and is likely to require additional surgeries as well.  In the near term, he will require frequent follow-up care that can only be provided outside the prison, and it is foreseeable that similar situations will arise in the future.  The Court is also mindful of Hussain's cognitive difficulties, which may have left him poorly situated to advocate for his own medical needs while incarcerated—being in the daily care of his family is likely to substantially improve his ability to receive timely and appropriate care.

Hussain has now served approximately 33 months of his 60-month sentence, and factoring in time good time credit he would be eligible for release December 26, 2024.  See 18 U.S.C. § 3624(b)(1).  He has accordingly served a substantial portion of the term of imprisonment imposed.

According to the United States Sentencing Commission, the general recidivism rate for non-production child pornography offenders is 27.6% within three years after release from incarceration.  U.S. Sent'g Comm'n, Federal Sentencing of Child Pornography: Non-Production Offenses 65 (2021).  This includes arrests for crimes that are not sex offenses or related to an individual's status as a sex offender, as well as arrest or revocation of a term of supervised release for failure to register as a sex offender and for other technical violations of

19

conditions of probation or supervised release. The sexual recidivism rate, that is, arrests for sexual offenses only, for these offenders over that same span was 4.3%. Id. As a more general matter, a lower criminal history category correlates to a lower recidivism rate. U.S. Sent'g Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview 19 (2016). And older offenders are less prone to reoffending—offenders between 41 and 50 at sentencing were rearrested at approximately half the rate of those sentenced when younger than 21. Id. at 23, App. A-1.

In considering the kinds of sentences available, section 3582(c)(1)(A) empowers a court to "reduce the term of imprisonment," but also allows a court to "impose a term of probation or supervised release with or without conditions" so long as the length of such a term "does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). The Court also notes that the condition of home detention, while indisputably a lesser punishment than a term of imprisonment, is still a significant punishment itself. The Sentencing Guidelines reflect this and direct that home detention may be imposed as a condition of supervised release, "but only as a substitute for imprisonment." U.S.S.G. § 5F1.2. See United States v. Leaphart, 98 F.3d 41, 43 (2d Cir. 1996) (applying U.S.S.G. § 5F1.2 and concluding that where defendant sentenced "to the maximum possible term of imprisonment," the sentencing judge "could not also sentence him to home detention" during a subsequent term of supervised release). Other supervised release conditions, such as community service, U.S.S.G. § 5F1.3, or even community confinement, id. § 5F1.1, contain no such restrictions. See United States v. Blackwell, 651 F. App'x 8, 9 (2d Cir. 2016) (noting that the Sentencing Guidelines distinguish between "home detention" and "curfew," in that only the former has a "substitute for imprisonment" restriction). And though not directly applicable here, in certain scenarios the

Sentencing Guidelines allow that a term of imprisonment may, in part, be satisfied by home detention on a "one day" to "one day" basis.  See, e.g., U.S.S.G. § 5C1.1(e)(3).  The Court concludes that imposing home detention as a substitute for the remainder of Hussain's term of imprisonment—as opposed to only reducing his sentence to time served—will still provide punishment reflecting the gravity of his offense.

Taking each of the applicable section 3553(a) factors into account, Judge Pauley reasoned that the guidelines range was "far more than necessary" and that the mandatory minimum 60-month sentence would "amply satisfy the ends of the criminal justice system . . . ." (Sent'g Tr. at 9.)  The Court has considered anew the history and characteristics of the defendant, the seriousness of the offense, and the other section 3553(a) factors and concludes that converting Hussain's remaining term of imprisonment to a term of 18 months of supervised release, with the added condition of home detention, and with all other terms and conditions of his sentence remaining in place, is sufficient, but not greater than necessary, to accomplish the goals of Hussain's "ample" original sentence.  See United States v. Roney, 833 F. App'x 850, 854 (2d Cir. 2020) ("[C]ourts regularly consider whether compassionate release would be consistent with § 3553(a) by considering how early release would impact the aims of the original sentence.").

CONCLUSION

For the reasons explained, Hussain's motion for a sentence reduction is GRANTED.  Hussain's remaining term of imprisonment is converted to time served plus a term of an additional 18 months of supervised release on home detention, subject to the same conditions of his existing term of supervised release.  Thus, his total term of supervised release

will be increased from 60 months to 78 months, with the first 18 months on home detention and with all other pre-existing conditions of supervised release for the full 78 months.

To permit orderly transition and release, this Order is stayed for 14 days.  The Clerk is directed to terminate the motion.  (ECF 50, 54.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
         July 12, 2023